**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| vs. | |
| EDUARDO GRIJALVA, | **Case No.  2:09CR90 DAK** |
| Defendant. | |

This matter is before the court on Defendant Eduardo Grijalva's Motion to Suppress.  An evidentiary hearing on the motion was held on May 15, 2009.   After briefing by the parties, closing arguments were heard on July 28, 2009.   At the hearings, Defendant was represented by Robert Breeze, and the United States was represented by Carol A. Dain.  Before oral argument, the court carefully considered all pleadings, memoranda, and other materials submitted by the parties.  Since taking the matter under advisement, the court has further considered the law and facts relating to this motion.  Now being fully advised, the court renders the following Findings of Fact, Conclusions of Law, and Order.

## FINDINGS OF FACT[1]

Jason Miller ("Detective Miller") and Detective Nicholas Schneider ("Detective Schneider") are assigned to the gang suppression unit with the Salt Lake City Police Department.

---

[1]  Much of the Detectives' testimony during the evidentiary hearing was contradicted by Defendant's testimony.   After evaluating the demeanor of the witnesses, their credibility on the stand, and the totality of the circumstances, the court makes the following findings of fact.

They patrol mainly the Glendale and Rosepark area of Salt Lake City.   Their duties include responding to gang-related calls and gathering information on gangs in the area.   They gather intelligence by talking to people to determine if they are involved in a gang or what the gangs in the area are doing.

On November 20, 2008, Detective Miller and Detective Schneider were patrolling in an unmarked police vehicle in the Rosepark area near North Temple in Salt Lake City.  At approximately 11:15 p.m., the Detectives noticed Eduardo Grijalva ("Defendant") walking in the area of 200 North and 800 West.  He was dressed in blue shirt, blue pants, blue shoes, and a gray hooded sweatshirt.   Blue colors are indicative of Sureños gang attire.   Detectives Schneider and Miller, traveling northbound made a U-turn at a break in the median in order to make contact with Defendant.   Detective Schneider then pulled alongside the curb, and Detective Miller, through a rolled down window, asked if Defendant would talk with them.   Neither Detective believed the deck lights or the spot light on the vehicle were turned on during their initial encounter with the Defendant.  Both Detectives were dressed in standard police issue Gang-Suppression Unit uniform, with a golf-type shirt and a with duty belt.   When Detective Miller rolled down his window and asked Defendant if he would mind speaking with them, Defendant replied "sure," and Defendant started walking toward the car.[2]

---

[2]  Defendant's testimony regarding the initial encounter was quiet different from the officers' testimony.   Defendant  testified that the red & blue lights were flashing, that the spot-light was on him, and that when asked if the officers could talk to him he replied, "no, I haven't done anything wrong."  He also testified that he did not approach the Detectives' car; rather, they exited their car and approached him.  While it is not an easy determination to make, the court credits the Detectives' testimony because of the consistency regarding the details of their

At this point, both Detectives exited the vehicle and walked toward Defendant.  The Detectives approached him casually and gave him no cause for alarm.  Detective Miller, in a conversational tone, asked Defendant where he was going and where he had been.  Defendant was acting somewhat casual.  When Detective Miller asked Defendant his name, the Detectives noticed the question made Defendant nervous, causing him to glance around and shift his weight from side to side.  This caused the Detectives to believe that Defendant may flee.  Defendant stated on at least two occasions that he had done nothing wrong and asked why he had to give his name when he had done nothing wrong.  The Detectives testified that Defendant had ample room on both sides and behind him to walk away.  While they did not inform him that he could leave, they did nothing to suggest that he couldn't leave.

After hesitating, Defendant eventually gave Detective Miller a name which was not his true name.  Detective Miller believed he was lying about his name and asked him why he was so nervous.  Defendant did not respond.  Detective Miller then asked Defendant if he had warrants. Defendant did not respond right away, at which point Detective Miller explained that he was not concerned with small warrants.  Defendant still did not respond, so Detective Miller asked if he had a big warrant.  The Detectives observed Defendant nod his head affirmatively, indicating to them that he had a big warrant.[3]  Believing Defendant had a warrant but fearing he would run if

testimony, their credibility on the stand, and the fact that even Defendant admitted that the officers were "casual" when they approached him (Tr. at 86), that they did not raise their voices (Tr. at 93), and that it was "conversational," in the beginning. (Tr. at 93.)

[3] Defendant testified that he did not respond in the affirmative, and he has placed significant emphasis on the fact that Detective Miller testified that "defendant *shook* his head

one of the Detectives went to verify the warrant, Detective Miller and Detective Schneider

moved toward Defendant and took him into custody.  For safety reasons, Detectives asked

Defendant if he had any weapons on him, and he indicated he had a gun down the back of his

pants. Detective Schneider retrieved the gun.   After retrieving the gun, Defendant was placed in

handcuffs.

        Once Defendant was in custody, Detective Miller obtained his true name and verified the

warrant.   Detectives called their sergeant to the scene to clear Defendant for transport to jail.

Defendant was cleared to go to jail, and during the transport to jail, Detective Schneider read him

his *Miranda* rights.  Detective Schneider then asked Defendant if he understood his rights and

asked if he would agree to talk to him.  Defendant said, "yeah." Defendant made admissions to

his possession of the gun.

### CONCLUSIONS OF LAW

        "The defendant bears the burden of establishing a Fourth Amendment violation." *United*

---

yes"and that Detective Scheider used the word "shook" in his report.  Defendant contends that if
he had indeed responded to this question about warrants in the affirmative, the word "*nod*" would
have been used.
        Regardless of the proper usage of *shook* and *nodded,* both Detectives convincingly
testified that they understood Defendant to respond in the affirmative when asked if he had a big
warrant.  Specifically, Detective Miller testified that Defendant "shook his head yes," (Tr. at 14),
"nodded in the affirmative," (Tr. at 39), and was "moving his head up and down." (Tr. at 40).
Detective Schneider testified that Defendant "nodded," (Tr. at 61); "gave a nod of yeah," (Tr. at
61), and he testified that "it was a definite up and down [of the head]," (Tr. at 62) that he was
under the impression that Defendant had a warrant, (Tr. at 62) and that "the up-and-down
shaking was enough for me that he had a warrant."  (Tr. at 74-75).   According to both
Detectives, there was no ambiguity in Defendant's response and therefore no need to clarify his
answer.

*States v. Patterson*, 472 F .3d 767, 775 (10th Cir. 2006).   The court finds that Defendant was not unlawfully seized at any time prior to the discovery of the firearm that forms the basis of the present indictment.

First, the court finds that the initial encounter with Defendant was based on a consensual encounter between Defendant and the Detectives.   The Fourth Amendment is not implicated "simply because a police officer approaches an individual and asks a few questions.  So long as a reasonable person would feel free to 'disregard the police and go about his business' the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).   It is possible that a consensual encounter can become a "seizure" in circumstances that establish that an officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *California v. Hodari D.*, 499 U.S. 621, 628 (1991).

However, "the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Id.*  In showing that a consensual encounter has become a seizure, a defendant must be able to identify objective facts that indicate when the seizure took place. "A seizure is a single act, and not a continuous fact." *Id.* at 625.  In "[d]etermining whether an encounter with law enforcement officials is consensual or constitutes a seizure requires a court to consider the totality of the circumstances and determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter."

5

*Bostick*, 501 U.S. at 439.   The Tenth Circuit has established a "nonexhaustive" list of factors used when making this determination:

> the threatening presence of several police officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed space; and absence of other members of the public.

*United States v. Ringold*, 335 F.3d 1168, 1172 (10th Cir. 2003) (citation omitted).   Nevertheless, underscoring that the test is the totality of the circumstances, the court emphasized that "one single factor can dictate whether a seizure took place." *Id.*   "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *U.S. v. Mendenhall*, 446 U.S. 544, 553 (1980) (quoting *Terry v. Ohio*, 392 U.S. 1, 34 (1968)).

Defendant was spotted by officers during a routine patrol in a high-crime area.   The Detectives noticed him due to his attire which appeared to be gang related.   They turned their car around and came alongside Defendant while he was walking.   The Detectives wanted to talk to Defendant in an effort to gain intelligence about gang activity in the area. Detectives asked if they could speak with him, and Defendant stopped to speak with the Detectives.   Detectives did not approach with lights and sirens nor did they command him to stop or restrict his movements in any way**.**   In fact, the Defendant indicated that the Detectives approach was casual and the tone was conversational**.**  The officers did not brandish a weapon, use physical force, or use aggressive language or tone of voice.   They also did not block Defendant's path.

6

Because there is nothing in the facts to show that a reasonable person would not have felt free to terminate the encounter, and because the officers never physically restrained Defendant or made any "show of force," the initial encounter between Defendant and the Detectives was a consensual encounter.

After the initial encounter with Defendant, he was lawfully detained after being placed under arrest and then searched incident to arrest.   An arrest must be based upon probable cause to believe that a crime was committed and the arrestee committed it. *Beck v. Ohio*, 379 U.S. 89 (1964).   The United States Supreme Court defines probable cause justifying arrest as "facts and circumstances within the officer's knowledge that are sufficient to warrant a reasonable person in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 21 (1979).   The Tenth Circuit has explained: "[p]robable cause to arrest exists when an officer, considering the totality of the circumstances before him, is led to a reasonable belief that an offense has been or is being committed . . . ." *U.S. v. Allen*, 235 F.3d 482, 488 (10th Cir. 2000), *cert. denied*, 121 S. Ct. 1643 (U.S. 2001).

One source of probable cause to arrest is a valid arrest warrant. "Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime."  *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996)(citing Fed. R. Crim. P. 4 and *Wong Sun v. United States*, 371 U.S. 471 (1963)). "Any peace officer who has knowledge of any outstanding warrant of arrest may arrest a person he reasonably believes to be the person described in the warrant . . ." Utah Crim. Pro. §

77-7-11(1953 as amended).

During the encounter with Defendant, Detectives observed him become nervous, "real fidgety, kind of shifty from side to side, looking around" when asked for his name. Detective Miller asked Defendant why he was so nervous, with no response.  Detective Miller than asked Defendant if he had warrants, and he did not reply.   Detective Miller advised Defendant that he was not worried about small warrants and then asked if Defendant's warrant was "big."  Detectives Miller and Schneider both stated that Defendant responded affirmatively, leading them to believe that he had a big warrant.   Based on their collective belief that the Defendant was the subject of a warrant, he was taken into custody without incident.  Detective Schneider contacted his dispatch and verified that Defendant had an outstanding warrant**.**

Officers may search an arrestee and the area under his immediate control, or within his reach.  *Chimel v. California*, 395 U.S. 752, 762-63 (1969).   The search is limited to looking for a weapon or evidence that may be destroyed or damaged.  *U.S. v. Edwards*, 242 F.3d 928, 937 (10th Cir. 2001).   In this case, Detectives searched Defendant subsequent to being taken into custody.  For safety reasons, Detective Miller asked Defendant if he had any weapons on him, and Defendant stated "he had a gun down the back of his pants."   Detectives retrieved a .22 caliber loaded handgun from the Defendant's rear waistband.

Defendant argues that Detective Miller violated Defendant's constitutional rights by asking him the location of the gun while Defendant was in custody and had not yet been Mirandized, therefore warranting suppression of the statement.  However, the Supreme Court has

8

found that, "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *New York v. Quarles*, 467 U.S. 649, 657 (1984).   The Tenth Circuit has recognized the public safety exception to the Miranda requirement and admitted statements made by defendants while in custody where the questions were necessary for public safety or officer safety.  *See United States v. Lackey*, 334 F.3d 1224 (10th Cir. 2003) (officers may ask a custodial suspect if he has a weapon before Mirandizing); *United States v. Padilla,* 819 F.2d 952, 960 (10th Cir. 1987) (officers may ask custodial suspect questions regarding condition of victim). Therefore, the court finds that Defendant's response to questioning regarding the location of the firearm is admissible under the public safety exception to *Miranda*.[4]

Finally, the court finds that Defendant's statements made to Detective Schneider are admissible.  These statements Defendant's statements made to Detective Schneider were made knowingly, voluntarily and intelligently and following Defendant's waiver of his *Miranda* rights to remain silent and to have an attorney present. "The Fifth Amendment privilege against self incrimination is fully applicable during a period of custodial interrogation. This constitution guarantee, however, may be waived provided the waiver is made voluntarily, knowingly and intelligently." *United States v. Johnson,* 42 F.3d 1312, 1317 &1318 (10th Cir. 1994)(citations omitted).

---

[4]  Under the "inevitable discovery" rule articulated in *Nix v. Williams*, Defendant was going to be searched whether he admitted to possessing the firearm or not, and the firearm would ultimately have been discovered. 467 U.S. 431, 444 (1984).

In determining whether Defendant waived his Miranda rights, the court must find by a preponderance of the evidence that Defendant waived his rights per *Miranda*, and the burden of proof is on the government. *Colorado v. Connelly,* 479 U.S. 157, 168 (1986).  "If a defendant talks to officers after invoking his right to counsel, the government bears the burden of proving by a preponderance of the evidence the waiver of the right was voluntary." *United States v. Roman-Zarate*, 115 F.3d 778, 782 (10th Cir. 1997) (citations omitted). "A waiver is voluntary if the totality of the circumstances demonstrates (1) the waiver was a product of free and deliberate choice rather than intimidation, coercion, or deception, and (2) the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving." *Id.*   In this case, the totality of the circumstances shows that Defendant freely and knowingly waived his right to counsel.

Detective Schneider's testimony was credible.   Detective Schneider testified that during the transport of Defendant to the jail, he advised Defendant of his rights per *Miranda* and that Defendant waived his rights and agreed to answer questions after which he conducted an interview with Defendant.  Detective Miller was present in the police vehicle when Defendant was given his *Miranda* rights.  Detective Schneider testified that Defendant understood his rights and when asked if he would talk to him, Defendant stated "yeah."

Both Detectives testified that Defendant was never threatened, nor was he made any promises.  Because there was no evidence of coercion or intimidation, the first prong of the *Roman-Zarate* test is met in this case.   Under the second prong of the test, Defendant's interaction with Detectives shows that he knew he did not have to speak with officers, and that it

was not advisable for him to do so.

Detective Schneider gave Defendant the *Miranda* warnings.  The Defendant indicated that he understood those rights.   Thus, the Defendant was aware both of his right to remain silent, and that a consequence of his choice to speak with Detectives would be the potential for his statements to be used against him.  Despite being aware of his rights and informed of the consequences, Defendant voluntarily chose to initiate a conversation with Detective Schneider about where he obtained the gun and why he possessed it.  Thus, his decision to do so constitutes a knowing waiver of his *Miranda* rights.

## CONCLUSION

Based on the above reasoning, IT IS HEREBY ORDERED that Defendant's Motion to Suppress is DENIED.

DATED this 27th day of August, 2009.

BY THE COURT:

_____

DALE A. KIMBALL
United States District Judge

11